**Exhibit D**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| PETER FRANKL and<br>JOHN DECKARD,<br><br>Plaintiffs,<br><br>v.<br><br>NETOPIA, INC., ALAN LEFKOF,<br>DAVID KADISH, WILLIAM D. BAKER,<br>ROBERT C. LEE, HOWARD T. SLAYEN,<br>HAROLD WILLS, and REESE M. JONES<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:05CV-1757B<br>ECF |

---

## PLAINTIFFS PETER FRANKL'S AND JOHN DECKARD'S
## FIRST AMENDED COMPLAINT

---

Plaintiffs Peter Frankl and John Deckard complain of Netopia, Inc., and Alan Lefkof, David

Kadish, William D. Baker, Robert C. Lee, Howard T. Slayen, Harold Wills, and Reese M. Jones,

individually and in their respective capacities as officers and directors of Defendant Netopia, Inc. and

file this suit to redress grievances for discriminatory and retaliatory termination under the

whistleblower protection provisions of the Sarbanes-Oxley Act of 2002 (SOX), 18 U.S.C.A. § 1514A,

defamation, breach of contract, and civil conspiracy, respectfully showing the Court as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Frankl is a citizen of the United States and a resident of Dallas County, Texas.

Plaintiff Frankl was employed by Defendants Netopia, Inc. and/or its predecessor beginning in

September 1996. At the time of his termination, he was the Vice President of Worldwide Enterprise

Sales & Marketing for Netopia, Inc.

EXHIBIT_____D_____PAGE____28

2.      Plaintiff Deckard is a citizen of the United States and a resident of Dallas County, Texas. Plaintiff Deckard was employed by Netopia, Inc. beginning in December 1997. At the time of his termination he was Netopia, Inc.'s Manager of Software Sales, Western Region.

3.      Defendant Netopia, Inc. is a Delaware corporation with headquarters and principal place of business in Emeryville, California. Defendant Netopia, Inc. is authorized to, and does, conduct business in the State of Texas and may be served with process upon its Registered Agent, C.T. Corporation, 350 North St. Paul Street, Dallas, Texas 75201.

4.      Defendant Alan Lefkof is an individual residing in California and may be served with process at 131 Sugarloaf Drive, Tiburon, California 94920. At all times relevant to this cause of action, Defendant Lefkof was President and CEO of Defendant Netopia, Inc.

5.      Defendant David Kadish is an individual residing in California and may be served with process at 67 Clarendon Avenue, San Francisco, California 94114. At all times relevant to this cause of action, Defendant Kadish was Senior Vice President and Chief Legal Counsel for Defendant Netopia, Inc.

6.      Defendant William D. Baker is an individual residing in California and may be served with process at 39206 Guardino Drive, #201, Freemont, California 74538. At all times relevant to this cause of action, Defendant Baker was Chief Financial Officer for Defendant Netopia, Inc.

7.      Defendant Robert C. Lee is an individual residing in California and may be served with process at 17 Magee Court, Maraga, California 94556. At all times relevant to this cause of action, Defendant Lee was a member of Netopia, Inc.'s Audit Committee.

8.      Defendant Howard T. Slayen is an individual residing in California and may be served with process at 2 Altee Court, Atherton, California 94027. At all times relevant to this cause of action,

EXHIBIT____D____PAGE__29__

Defendant Slayen was a Netopia Director and Chairman of Netopia's Audit Committee.

9.    Defendant Harold Wills is an individual residing in California and may be served with process at Netopia, Inc., 6001 Shellmound Street, 4th Floor, Emeryville, California 94608.  At all times relevant to this cause of action, Defendant Wills was Chairman of Netopia, Inc.'s Board of Directors.

10.    Defendant Reese M. Jones is an individual residing in California and may be served with process at Netopia, Inc., 6001 Shellmound Street, 4th Floor, Emeryville, California 94608.  At all times relevant to this cause of action, Mr. Jones was the found and former Chairman of the Board of Netopia, Inc.

11.    Defendant Netopia, Inc. is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78l, or that is required to files reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(d), defined in Section 806 of SOX, 18 U.S.C.A. § 1514A(a).    Defendant Netopia, Inc. conducts business within, and significantly affects and operates within, Dallas County, Texas.

12.    All individual Defendants named above in Paragraphs 4-10 above, were at all relevant times officers, directors, employees, and/or agents of Defendant Netopia, Inc.

13.    This Court has jurisdiction to hear the merits of Plaintiffs Frankl's and Deckard's claims under 28 U.S.C.A. §§ 1331 and 1343, as well as 18 U.S.C.A. § 1514A, the whistleblower protection provisions of SOX.

14.    Venue is proper in this District and Division pursuant to 28 U.S.C.A. § 1391(b).

## II. <u>FACTUAL BACKGROUND</u>

15.    Plaintiffs were terminated on September 20, 2004, because they provided information to outside investigators engaged by Netopia, Inc.'s Audit Committee to review a series of accounting

---

EXHIBIT____D____PAGE____30____

irregularities. Members of the Audit Committee included Defendants Robert C. Lee, Howard T. Slayen, and Harold Wills. The information provided by Plaintiffs implicated the above-named officers and directors of Netopia, Inc. in transactions that were calculated to defraud Netopia, Inc.'s shareholders, and which are now the subject of an investigation by the Securities and Exchange Commission (SEC) as well as various shareholder lawsuits.

16.    During the investigation, Plaintiffs identified the role of Alan Lefkof, Netopia's President and CEO, and David Kadish, Netopia's Senior V.P. and Chief Legal Counsel, in directing that certain invoices be created to reflect a sale of Netopia products contrary to the company's usual payment terms. This irregular transaction resulted in a false inflation of the company's earnings, a jump in profits, and a resulting increase in the value of the company's stock price. As a result of the manipulation of the questioned transaction – which had been booked as a sale one quarter and then written off as uncollectable the next – Netopia, Inc. reported a profit for the first time in 39 quarters.

17.    As a result of Defendants Lefkof and Kadish's manipulation of this transaction, Netopia, Inc.'s stock price was intended to, and did increase for the quarter in question so that Defendants, and each of them, could reap personal gain from the stock's price increase, to the detriment of Netopia, Inc.'s remaining shareholders. Subsequently, Lefkof, Kadish, and the other Netopia officers and Directors named above sold substantial shares in the company and reaped personal benefit from the sale.

18.    On or about July 22, 2004, Plaintiffs Frankl and Deckard received memos from Defendant Slayen, directing them to participate in an Audit Committee investigation by outside counsel, the law firm of Morrison & Foerster, involving "certain aspects of the company's historical financial accounting and reporting." Frankl and Deckard were instructed to cooperate fully with this investigation, and each was individually questioned at length by two attorneys from the Morrison & Foerster law firm, acting as agents for, and at the direction of, Netopia, Inc. and the Netopia, Inc.

EXHIBIT____D____ PAGE____31____

Audit Committee.

19.     In the course of the investigation by outside counsel acting on behalf of the Netopia, Inc. Audit

Committee, Plaintiffs Frankl and Deckard provided certain communications and other information

that shed light, for the first time, on the role of Defendant Lefkof and Defendant Kadish in directing

that certain invoices be created to reflect a sale of Netopia, Inc. products contrary to the company's

usual payment terms.  The Audit Committee initiated this investigation because these transactions

resulted in false inflation of Netopia, Inc.'s earnings, a jump in profits, and a resulting increase in the

value of Netopia, Inc.'s stock price.  As a result of Defendants Lefkof's and Kadish's  manipulation

of the transaction at issue – which was booked as a sale one quarter and then written off and

uncollectable the next – Netopia, Inc. reported its first profitable quarter in over three years.

20.     Specifically, Plaintiff Frankl made the Audit Committee's counsel aware of Defendant

Lefkof's role in manipulating a transaction with Interface Computer Company (ICC) in 2003.  This

transaction involved a sale of software to ICC for resale to its end user, the Philadelphia school

system. Defendant Lefkof directed Plaintiff Frankl to book the transaction by the end of the quarter,

*i.e.*, September 30, 2003, because this sale would help the company hit their target number for the

quarter in question.  The natural closing of this transaction would have taken several more months.

Plaintiff Frankl was not in a position to manipulate – or even to know – the effect of this transaction

on Netopia, Inc.'s earnings for the quarter in question.  Defendant Lefkof, on the other hand, was

privy to this information and was manipulating the company's earnings.

21.     Unlike Netopia, Inc.'s principals, Plaintiff Frankl had no incentive to manipulate this

transaction for personal gain.  As Vice President of Sales and Marketing, Plaintiff Frankl was in a

position to receive only 50% of a 1% commission override – approximately $3,750 – for this

EXHIBIT____D____PAGE__32__

transaction. The sales representative – who did not provide inculpatory information to the investigators and was, therefore, not terminated – received a far more substantial sum.

22.     The Audit Committee's counsel also learned from Plaintiff Frankl that not only Defendant Lefkof, but also Netopia, Inc.'s General Counsel, Defendant Kadish, and Netopia, Inc.'s CFO, Defendant Baker, knew about, and participated in, the contingent nature of the ICC/Philadelphia transaction. The timing of ICC's $750,000 payment for the software was contingent upon its receiving a purchase order from its end user. Plaintiff Frankl never represented that the deal was non-contingent and did not prepare the Purchase Order for the ICC transaction. Defendant Kadish, however, was aware of this contingency and prepared the Purchase Order that he directed Plaintiff Frankl to submit to ICC.

23.     During the Audit Committee investigation, Plaintiff Frankl made counsel aware of Defendant Kadish's role in drafting and submitting the ICC Purchase Order. He informed the investigators that all parties involved knew that payment depended upon ICC's receiving a Purchase Order from the Philadelphia school system and that it was Defendant Kadish who prescribed the Purchase Order to be used. Although the Purchase Order prepared by Defendant Kadish did not reflect that payment was contingent on any other event, it was a drastic aberration from standard Netopia, Inc.'s standard policy because it included no terms of payment whatsoever – clearly because Defendant Kadish knew it would not be paid within 30 days. His objective was solely to have the sale finalized and on Netopia, Inc.'s books by September 30, 2003.

24.     In other words, Lefkof and Kadish specifically directed Plaintiffs' actions with respect to the ICC transaction and were aware  – as was Netopia's CFO Baker – that the transaction was booked as a sale but was not anticipated to be paid until a later date. Mr. Frankl and Mr. Deckard were

involved in no illegal conduct and no wrongdoing whatsoever. They did not realize, at the time the sale was booked and slotted for payment months later, that the company's principals intended this transaction to result in a profit for the company that quarter so that they could reap personal gain from the stock's price increase to the detriment of Netopia's shareholders. Further, they had no reason to anticipate that these same principals would then treat the ICC transaction as delinquent and uncollectible on the books of the company the following quarter, thus generating the Audit Committee investigation and squarely directing the blame at them. Nevertheless, when this irregular transaction came to light, Plaintiffs were blamed for manipulating invoices and allegedly causing the write-off to occur.

25.    The ICC/Philadelphia Schools transaction was collected and the write-off restated after Plaintiffs' termination. The date of collection was completely in keeping with the initial terms agreed upon by the customer with Netopia, Inc.'s principals when the sale was booked.

26.    In addition to the ICC/Philadelphia Schools transaction, the Audit Committee's external investigation also addressed a prior transaction with ICC involving a sale of software for resale to the Chicago Public Schools. At the time of this sale, Plaintiff Deckard shared the exact details of the ICC/Chicago Public Schools transaction directly with Defendant Lefkof during a conference call on the day that the Purchase Order was received. In addition, Defendant Lefkof received a fax copy of the original Purchase Order. Thereafter, Netopia's own accounting department directed Plaintiffs Frankl and Deckard to eliminate certain terms from the Purchase Order. Netopia, Inc.'s Controller and other Netopia, Inc. management fully understood the payment structure of the ICC/Chicago transaction, including Netopia's CFO, Defendant Baker.

27.    All documents memorializing the ICC/Chicago Schools transaction were, therefore, created

EXHIBIT_____D_____ PAGE__34__

with the knowledge and consent of Netopia, Inc.'s management. Defendant Lefkof directed Plaintiff Deckard to make certain changes to the Purchase Order, and all changes were made with the customer's approval. However, after Plaintiff Deckard's cooperation with the Audit Committee's external investigators, and after providing information about management's role in the transaction, he was terminated allegedly for altering the terms of this sale. This was merely pretext for unlawful retaliation.

28.    Plaintiffs were involved in no illegal conduct and no wrongdoing whatsoever. Instead, Defendants Lefkof and Kadish, acting on behalf of Netopia, Inc., as well as other members of Netopia, Inc.'s Board of Directors and Audit Committee, specifically directed the Plaintiffs' actions in concluding the transaction at issue with the intent that the transaction be booked as a sale, although it was not anticipated to be paid until a later date.

29.    While Plaintiffs lost their long-term employment with Netopia, Inc. as a result of this sham audit process, Defendants Lefkof and Kadish, along with other top executives – including members of the Netopia, Inc. Audit Committee, such as Defendants Lee, Slayen, and Wills – reaped significant profits by a sale of their stock at its inflated value and suffered no adverse consequences. Plaintiffs' protected conduct was, at a minimum, a contributing factor in their termination. This adverse personnel action was retaliation for their role in the investigation.

30.    Neither Plaintiff engaged in any improper transaction. It was Netopia, Inc.'s manipulation of the transactions with ICC that resulted in illegal activity. Because of Netopia, Inc.'s manipulation, these transactions came under scrutiny, and both Plaintiffs cooperated with investigations by the SEC and the Netopia, Inc. Audit Committee. Critically, it was Plaintiffs who first made the external investigators aware of Netopia, Inc. management's role in possible shareholder fraud, and Plaintiffs

EXHIBIT_____D____ PAGE___35

were terminated for providing this information to the investigators.

31.    On or about December 1, 2004, Defendant Lefkof addressed a meeting of Netopia, Inc.'s national sales and marketing personnel in Emeryville, California. During that address, Lefkof specifically stated that Frankl and Deckard were terminated for dishonest and improper activities in the course of their dealings with Netopia, Inc. customers. After addressing the entire sales and marketing force, Lefkof – at his own instance – met separately with just the Texas employees, where he repeated his defamatory rhetoric.

32.    Specifically, Lefkof stated that Frankl and Deckard had engaged in a practice of altering documents and engaging in improper "side agreements" with Netopia customers in order to reap personal benefit. Lefkof made these statements on his own initiative, and they were not prompted by any questions or comments by other personnel in attendance at the meeting.

33.    In addition to these comments to the entire Netopia sales and marketing force, Lefkof specifically requested another employee from the Dallas office to reserve a table because he wanted to speak further about these matters with only the Texas employees. With only Texas employees in attendance, Lefkof again launched into derogatory statements about Frankl and Deckard. Again, these statements were made on his own initiative and were not prompted by questions or comments from anyone in the group of Texas employees.

34.    Lefkof repeated to Texas sales and marketing personnel that Frankl and Deckard had engaged in irregular and dishonest practices and acknowledged that the Texas employees should inform customers that Frankl and Deckard had been terminated because of their conduct. Netopia, Inc. has several major accounts in Texas, including Verizon, EDS, SBC, University of Texas/Austin, TXU, and Texaco. Verizon and SBC are two of Netopia's largest customers. Lefkof concluded his comments by stating that all employees were free to ask further questions about what had happened

EXHIBIT_____D_____PAGE___36___

in the Dallas office, but cautioned that they should not put anything in writing.

35.     On this occasion, Lefkof explicitly described conduct by Frankl and Deckard that was dishonest and contrary to acceptable practices in the industry.  Employees from the Texas office clearly understood the import of his remarks, and expressed their shock that the company's CEO would openly make these accusations.

### III. CAUSES OF ACTION

### A.     TERMINATION IN VIOLATION OF SOX WHISTLEBLOWER PROTECTION PROVISION

36.     Plaintiffs Frankl and Deckard reassert each and every allegation set forth in Paragraphs 1 through 35, above, and incorporate them by reference as if specifically stated herein.

37.     Defendants discriminated against Plaintiffs Frankl and Deckard by conspiring to terminate their employment, by terminating their employment on or about September 20, 2004, and by refusing to pay commissions which had been earned and were due and payable at the time of their termination, all in discrimination or retaliation for lawful acts by Plaintiffs Frankl and Deckard to provide information, or cause information to be provided, regarding conduct which Plaintiffs reasonably believed constituted a violation of rules and/or regulations of the Securities & Exchange Commission and/or provisions of federal law relating to fraud against shareholders.  Plaintiffs Frankl and Deckard provided this information and/or assistance to a person with supervisory authority over them, or to such other person working for their employer who had the authority to investigate, discovery, or terminate this conduct.

38.     Defendants Robert C. Lee, Howard T. Slayen, and Harold Wills were all members of the Netopia Audit Committee and individually engaged in the scheme to retaliate against Plaintiffs.  Upon

EXHIBIT_____D_____PAGE___37___

information and belief, each of these Defendants as well as Defendants Baker, Lefkof, and Kadish, knowingly and willingly took part in the decision to terminate Plaintiffs' employment. They knew of Kadish's and Lefkof's roles and their culpability in manipulating Netopia's stock price, but rather than punish the true wrongdoers for their securities fraud, they chose to terminate Plaintiffs Frankl and Deckard for their good faith participation in the Morrison & Foerster investigation, which followed explicit instructions to participate in such investigation. The acts of each of these individual members of Netopia's Audit Committee, as well as Defendants Baker, Lefkof, and Kadish, in facilitating Plaintiffs' terminations constituted unlawful retaliation.

39.    By their actions of conspiring to terminate Plaintiffs' employment, by terminating Plaintiffs' employment, and by denying Plaintiffs their earned commissions due and payable at the time of termination, Defendants, and each of them, violated Section 806 of SOX, 18 U.S.C.A. § 1514A.

40.    Because Plaintiffs have suffered unlawful retaliation for protected activity under SOX, they are entitled to all remedies afforded by 18 U.S.C.A. § 1514A(c) and (d), including back and front pay, compensatory damages, special damages, punitive damages, litigation costs, and reasonable attorneys' fees, all with interest at the legal rate. Plaintiffs, therefore, seek all relief necessary to make them whole, including compensatory damages, as follows:

    a.    the amount of back pay including all compensation, commissions, bonuses, and other benefits of employment that Plaintiffs, and each of them, would have earned had they not been terminated, with applicable interest; and

    b.    front pay, taking into consideration the same seniority status, compensation, bonuses, commissions, and other benefits of employment that Plaintiffs, and each of them, would have had but for their discriminatory and retaliatory termination; and

EXHIBIT_____D_____ PAGE 38

c.     compensation for any special damages sustained as a result of the retaliation and discrimination by Defendants, including litigation costs, expert witness fees, and reasonable attorneys' fees.

## B.     <u>DEFAMATION</u>

41.     Plaintiffs Frankl and Deckard reassert each and every allegation set forth in Paragraphs 1 through 35, above, and incorporate them by reference as if specifically stated herein.

42.     Through his statements, Defendant Alan Lefkof committed the tort of defamation against Plaintiffs. Based on the doctrine of *respondeat superior*, the defamatory statements may also be attributed to Defendant Netopia, as Defendant Lefkof made such statements in the course and scope of his employment. Further, Netopia ratified and approved the conduct of Defendant Alan Lefkof with full knowledge that he was acting with malice.

43.     The defamatory statements constitute defamation per se in that they suggested that the Plaintiffs were guilty of criminal activity.

44.     The Defendants published the defamatory statements set out above when Alan Lefkof made these statements in Netopia's International Sales Meeting, and to customers, vendors and investors while acting in scope of his employment as President of Netopia. All of the persons who heard the defamatory statements understood that the statements were defamatory in the manner described above. Furthermore, all of the persons who heard the defamatory statements understood that they referred to the Plaintiffs.

45.     The defamatory statements set forth above were false. The truth is that Plaintiffs were fired in retaliation for providing information to a Sarbanes Oxley Audit Committee that potentially incriminated other officers and directors of Netopia. The Defendants' publication of the defamatory

statements were not privileged because the Defendants did not limit their publication of the statements to those with a legitimate interest in the information. The statements were voluntarily published to the Plaintiffs' co-workers, who did not ask the Defendants for, and had no legitimate reason for knowing, the details of why the Plaintiffs were no longer at work. The Defendants published the defamatory statements with knowledge that they were false or with substantial grounds for knowing that they might be false and reckless disregard to whether they were true or false.

46.    The false statements were made with malice; that is, to cause substantial injury to Plaintiffs. The statements were made by Lefkof voluntarily, without prompting from the Netopia employees to whom he was addressing. The statements had no purpose but to inflict harm to the reputation of Plaintiffs and to hamper their ability to find employment in their geographic area.

47.    Plaintiffs reside in Dallas, Dallas County, Texas, and have resided there for the past several years. Prior to the publication of the defamatory statement described above, Plaintiffs enjoyed a reputation for industry, dependability, openness, and honesty.

48.    As a direct and proximate result of the Defendants' publication of the defamatory statements, the Plaintiffs' reputations have been severely injured. The allegations contained in the defamatory statements have caused Plaintiffs to suffer extreme mental anguish, public humiliation, and embarrassment. Plaintiffs also encountered difficulties in finding employment. All of this has caused pecuniary injuries.

49.    Furthermore, Plaintiffs are entitled to exemplary Damages from Defendant Alan Lefkof and Netopia because they acted with the malice required to support an award of exemplary damages. Alan Lefkof, and thereby Netopia, acted with a specific intent to cause injury to the Plaintiffs or with conscious indifference to the rights, safety, or welfare of the Plaintiffs, with actual, subjective

EXHIBIT_____D_____PAGE___40___

awareness that their conduct involved an extreme degree of risk of harm to the Plaintiffs. In particular, because the Plaintiffs had previously accused this Defendant of participation of a scheme to defraud the company, Defendant Lefkof had told the Plaintiffs that he would use any excuse to fire them, and published the statements wrongfully accusing Plaintiffs when he knew that the statements were false and that they would inflict severe emotional and financial damage on the Plaintiffs.

## C.    BREACH OF CONTRACT

50.    Plaintiffs Frankl and Deckard reassert each and every allegation set forth in Paragraphs 1 through 35, above, and incorporate them by reference as if specifically stated herein.

51.    On a yearly basis, Plaintiffs each entered into the Plans. The Plans were substantially similar and each paid certain commissions to motivate its employees and managers. Plaintiffs are owed commissions pursuant to the terms of the Plans.

52.    With respect to termination, the Plans provide: "within 60 days after...termination for any reason, 50% of the normal commission amount will be paid. Beyond the 60-day period after termination, no software commission will be earned or paid."

53.    Plaintiffs calculated and demanded the commissions owed to them pursuant to the Plans, but Defendant Netopia has refused to pay the commission.

54.    Thus, Defendant Netopia has breached its obligations to make payments to Plaintiffs pursuant to the terms of the Plans and Plaintiffs have been damaged by the breach.

## D.    CIVIL CONSPIRACY

55.    Plaintiffs Frankl and Deckard reassert each and every allegation set forth in Paragraphs 1 through 54, above, and incorporate them by reference as if specifically stated herein.

56.    As set forth above, Plaintiffs believe that Defendants Lefkof, Kadish, Lee, Slayen, Baker and

EXHIBIT_____D_____PAGE____41

Wills acted together and also in cohorts with Defendant Netopia, Inc. to unlawfully retaliate against Plaintiffs in violation of SOX. While Plaintiffs believe that each Defendant separately and individually violated SOX provisions, these individual Defendants also conspired with each other, and with Defendant Netopia, to unlawfully retaliate against Plaintiffs.

57.    Each of these Defendants acted in concert to accomplish the eventual termination of Frankl and Deckard for disclosing information to an independent auditor. Upon information and belief, they collaborated to form the decision to terminate Plaintiffs' employment, even after learning of Kadish's and Lefkof's culpability following the Morrison & Foerster investigation. This overt collaboration was in furtherance of their conspiracy.

58.    As a direct and proximate result of this retaliatory scheme the conspiracy to further the scheme, Plaintiffs, Frankl and Deckard were terminated from their employment and suffered financial harm.

**E.    ATTORNEYS' FEES**

59.    Netopia's conduct as described above and the resulting damages and loss to Plaintiffs have forced Plaintiffs to hire the law firm of Gibson, McClure, Wallace & Daniels, L.L.P. to collect the amount due and owing, and Plaintiffs have agreed to pay its attorneys reasonable attorneys' fees for their services.

60.    Demands for payment of the amount owed have been made on Defendant. More than thirty (30) days have elapsed since the demands for payment were made on Defendant.

61.    Upon judgment being rendered herein, Plaintiffs are entitled to collect and hereby sues to recover its reasonable attorneys' fees and expenses at the trial court and on appeal, if necessary, under § 38.001, *et. seq.* of the TEXAS CIVIL PRACTICE & REMEDIES CODE.

## IV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Frankl and Deckard request that Defendants, and each of them, be summoned to appear and answer and that, on final trial, judgment be granted against Defendants, joint and severally, awarding Plaintiffs Frankl and Deckard the following relief:

    a.      back pay, with interest, including without limitation lost wages, bonuses, commissions, benefits, and other benefits of employment;

    b.      front pay, taking into consideration all future compensation, commissions, bonuses, and benefits of employment with the same seniority status that each Plaintiff would have enjoyed but for his discriminatory and retaliatory termination;

    c.      compensation for all special damages sustained as a result of Defendants' discriminatory and retaliatory conduct, including litigation costs, expert witness fees, and reasonable attorneys' fees;

    d.      pre-judgment and post-judgment interest, as allowed by law;

    e.      attorneys' fees and costs of suit; and

    f.      such other and further relief as this Court may deem just and proper.

EXHIBIT_____D_____PAGE____43

Respectfully submitted,

**GIBSON, McCLURE, WALLACE & DANIELS, L.L.P.**


BY:    /S/ Wade L. McClure
          Wade L. McClure
          Texas Bar No. 13428700
          Ruth Ann Daniels
          State Bar No. 15109200
          Jonni Walls
          State Bar No. 20793650
          8080 N. Central Expressway
          Suite 1300, LB 50
          Dallas, Texas 75206-1838
          (214) 891-8040
          (214) 891-8010 Facsimile

          **ATTORNEYS FOR PLAINTIFFS**
          **PETER FRANKL and JOHN DECKARD**


## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on November 27th, 2006, a true and correct copy of this instrument was filed electronically, notice of the filing was served on Counsel for the Defendants by operation of the Court's electronic filing system, and the parties may access this filing by and through the Court's electronic filling system.


/s/ Wade L. McClure

**WADE L. MCCLURE**

EXHIBIT_____D_____ PAGE____4/4____

**Exhibit E**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**SAN FRANCISCO DISTRICT OFFICE**
**44 Montgomery Street**
SUITE 2600
SAN FRANCISCO, CALIFORNIA 94104

DIRECT DIAL: (415) 705-2459
FAX NUMBER: (415) 705-2331

August 27, 2004

<u>**VIA FACSIMILE (212) 909-5685 & FIRST CLASS MAIL**</u>

Claudia Taft, Esq.
  General Counsel
c/o Steven B. Carlin, Esq.
KPMG LLP
280 Park Avenue, 8th floor
New York, New York  10017

Re:    <u>In the Matter of Netopia, Inc. File No. MSF-02846</u>

Dear Mr. Carlin:

This office is conducting an informal inquiry into the above referenced matter to determine whether certain provisions of the federal securities laws have been violated.

Accordingly, we request that you voluntarily provide us with the documents and information that are more fully described on the enclosed "Attachment." For your convenience, you may produce photocopies of the requested documents. If you do produce copies, however, you should maintain the originals. We will notify you if and when such originals are required. The materials should be sent to the undersigned at:

U.S. Securities and Exchange Commission
44 Montgomery Street, Suite 2600
San Francisco, CA  94104
Attention:  Sheila E. O'Callaghan

Documents produced in response to our request should be accompanied by a list briefly identifying each document or other material and the item or items of the request to which it relates. Please also indicate whether a diligent search has been made for the requested documents and whether you have produced all of the documents called for by the request. We ask that if for any reason any of the requested documents are not furnished, that you list and indicate the location of such materials and the reason for non-production.

EXHIBIT____*E*____ PAGE____45____

KPMG LLP
Page 2

In addition, if any requested document is withheld because of a claim of attorney client privilege you should identify:  (a) the attorney and client involved; (b) all persons or entities shown on the document to have received or been sent the document; (c) all persons or entities known to have been furnished the document or informed of its substance; (d) the date of the document; and (e) the subject matter of the document.

This inquiry is confidential and should not be construed as an indication by the Commission or its staff that any violations of the law have occurred, nor should it be considered a reflection upon any person, entity or security.

The materials should be sent to the undersigned no later than September 10 at the address indicated above.

Enclosed please find SEC Form 1662 entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena."  It describes certain considerations involved in providing information to the staff, including the staff's "routine uses" of information.

If you have any questions relating to this request please contact the undersigned at (415) 705-2459.  The office's general telephone number is (415) 705-2500 and the fax number is (415) 705-2331.

Very truly yours,

Sheila E. O'Callaghan
Senior Counsel

Enc.:  Form 1662
       Attachment

cc:   Karen Kennard, Esq.
      Bingham & McCutchen LLP

EXHIBIT____ $\overline{12}$ ____ PAGE ____46____

## ATTACHMENT

### In the Matter of Netopia, Inc., File No. MSF-02846
### August 27, 2004

## I.   DEFINITIONS AND INSTRUCTIONS

"KPMG" means KPMG LLP, its partners, officers, employees, attorneys, accountants, agents, affiliates, subsidiaries, and anyone acting on behalf of the company with express, implied, or apparent authority to do so.

"DOCUMENT" or "DOCUMENTS" means any and all records and information in the possession, custody or subject to KPMG's control, whether drafts or finished versions, originals or annotated or non-identical copies, however and by whomever created, produced or stored (manually, mechanically, electronically or otherwise) including, but not limited to, books, papers, files, notes, account statements, confirmations, reports, correspondence, electronic files, electronic mail, memoranda, ledger sheets, reports, telegrams, telexes, telephone bills, pager bills, messages or logs, notes or minutes of conversations or meetings, contracts, agreements, calendars, datebooks, diaries, computer programs, records of billings, checks, receipts, wire transfers, drafts for money, records of payment, magnetic tape, tape recordings, disks, diskettes, diskpacks or other electronic media, microfilm, microfiche, and other storage devices.

"ENGAGEMENT" means all accounting, financial, and management services performed by KPMG for NETOPIA, including, but not limited to, audits, reviews (including all quarters during the period), compilations, extended procedures, consulting services, due diligence, special projects, investigations and other services performed.

"NETOPIA" means Netopia, Inc., its officers, directors, employees, attorneys, accountants, agents, affiliates, subsidiaries, and anyone acting on behalf of the company with express, implied, or apparent authority to do so.

The terms "each," "any," and "all" are mutually interchangeable and are meant to encompass one another so as to make a request broadly inclusive rather than narrowly exclusive. Similarly, the conjunctive form "and" and the disjunctive form "or" are mutually interchangeable. Use of either the singular or the plural should not be deemed a limitation, and the use of the singular should be interpreted as including the plural form and vice versa.

Each request is for the time period October 1, 2001 through the date of production, unless otherwise noted.

EXHIBIT____E____PAGE____47____

II.  DOCUMENTS TO BE PRODUCED

A.  All DOCUMENTS relating to the ENGAGEMENT of NETOPIA , including, but not limited to, the following:

1.  All DOCUMENTS relating to NETOPIA 's policies and procedures regarding: (1) revenue recognition, and (2) accounts receivable and related collectibility documents maintained by NETOPIA;

2.  All DOCUMENTS concerning NETOPIA 's internal controls, including, but not limited to, memoranda, notes, internal control questionnaires, flow charts, evaluations, studies, checklists, or preliminary phase review notes;

3.  All DOCUMENTS concerning potential fraud or illegal acts by NETOPIA;

4.  All DOCUMENTS concerning engagement suitability, acceptance, or continuation, including, but not limited to, pre-ENGAGEMENT correspondence, proposals, memoranda, notes, reports, or studies;

5.  All DOCUMENTS describing the scope of the ENGAGEMENT, and any conditions or limitations placed upon the scope of the ENGAGEMENT, including, but not limited to, all engagement letters;

6.  All DOCUMENTS concerning any communication with any other accounting or auditing firm, including, but not limited to, correspondence, memoranda, notes, agendas, and schedules;

7.  DOCUMENTS sufficient to identify the names, titles, and current business addresses of all KPMG partners and staff associated with the ENGAGEMENT, and all DOCUMENTS reflecting the lines of authority and responsibilities of KPMG staff members performing work on the ENGAGEMENT;

8.  All working papers, regarding revenue recognition, accounts receivable and related collectibility documents including an index or legend that describes the referencing system and any abbreviations used in the working papers;

9.  All adjusting entries, reclassification entries, and consolidations, both proposed and accepted;

10.  All DOCUMENTS concerning any programs used in the ENGAGEMENT, including, but not limited to, audit, review, compilation, and agreed-upon procedure programs. and any

EXHIBIT____E____ PAGE__48

additions, deletions, substitutions, or amendments thereto, and all DOCUMENTS reflecting the reasons for such additions, deletions, substitutions, or amendments;

11. All charts of NETOPIA accounts with descriptions of the use of each account;

12. All permanent files or continuing audit or review files, including superseded files, contracts, minutes of meetings, leases, and all other DOCUMENTS contained in such files;

13. All correspondence relating to the ENGAGEMENT;

14. All representation letters, including, but not limited to, representation letters from NETOPIA management;

15. All letters to management, or letters to the NETOPIA Board of Directors or any committee or members thereof;

16. All point sheets, findings, "to do" lists, memoranda of matters for the attention of the partner and concurring partner, top file memoranda, review memoranda, problems memoranda, partner and concurring partner's memoranda, senior manager and/or manager's memoranda, supervisor's memoranda, senior's memoranda, summary memoranda, post-audit review notes, quality control review notes, and all other writings or memoranda that describe, summarize, evaluate, highlight, or analyze the ENGAGEMENT or specific issues or problems that arose during the ENGAGEMENT;

17. All financial statements with accompanying footnotes (including, but not limited to, filings with the Securities and Exchange Commission) and auditor's reports, as originally drafted, revised, and finalized;

18. All DOCUMENTS reflecting communications between the NETOPIA ENGAGEMENT and KPMG's national office regarding NETOPIA;

19. All diaries, notes, business calendars, appointment books, or other writings of engagement partners and concurring partners, senior manager and/or managers, supervisor accountants, and senior accountants, reflecting meetings, contacts, conversations with the NETOPIA Board of Directors or any committee or member thereof, or any NETOPIA officer or employee; and

EXHIBIT___E___ PAGE___49___

20. All DOCUMENTS analyzing or reflecting hours spent by KPMG partners, senior manager and/or managers, consultants, audit, and national office accounting staff providing services to NETOPIA.

B. All DOCUMENTS concerning any errors, irregularities, or adjustments identified by KPMG in the course of providing any services to NETOPIA.

C. All DOCUMENTS concerning the resignation, termination, removal, or disciplining of any NETOPIA officer or employee for engaging in, or causing NETOPIA to engage in, any actual or possible irregularity, reporting violation, fraud, or violation of the federal securities laws.

D. All DOCUMENTS concerning all meetings of the NETOPIA Board of Directors, or any committee thereof, including, but not limited to, minutes (and exhibits thereto), agendas, notes, resolutions, and all DOCUMENTS prepared for, provided, distributed, or displayed in connection with any such meeting.

E. All DOCUMENTS reflecting communications with any person assigned to the ENGAGEMENT concerning document retention or destruction.

F. All DOCUMENTS not listed above relating to any impending restatement of NETOPIA'S financial results for any fiscal quarter and/or fiscal year.

G. All DOCUMENTS relating to the potential restatement of financial results, including but not limited to, NETOPIA'S discovery of facts calling into question the appropriateness and timing of revenue recognition involving a single-transaction license fee of $750,400, as announced in NETOPIA'S press release dated July 22, 2004.

H. All DOCUMENTS relating any potential restatement of financial results, and NETOPIA'S discovery and investigation of facts calling into question the appropriateness and timing of revenue recognition for various transactions as announced in NETOPIA'S press release dated July 22, 2004.

I. All DOCUMENTS regarding any other accounting issue being investigated by NETOPIA'S audit committee.

J. All personnel files or information normally maintained in a personnel file, including but not limited to, reviews, compensation-related documents and performance evaluations for all KPMG partners and staff associated with the ENGAGEMENT.

EXHIBIT____E____ PAGE___50___

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

### Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena

### False Statements and Documents

Section 1001 of Title 18 of the United States Code provides as follows:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

### Testimony

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony whenever during your testimony you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned to afford you the opportunity to arrange to do so.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any

SEC 1662 (9-02)

EXHIBIT _E_ PAGE _51_

witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury*. Section 1621 of Title 18 of the United States Code provides as follows:

> Whoever . . . having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly ... wilfully and contrary to such oath states or subscribes any material matter which he does not believe to be true... is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years or both . . . .

5. *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

### Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director, Regional Director, or District Administrator with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

EXHIBIT ___F___    PAGE _52_

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

## Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

## Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the

3

EXHIBIT ___E___    PAGE ___53___

subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

## Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

## Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To coordinate law enforcement activities between the SEC and other federal, state, local or foreign law enforcement agencies, securities self-regulatory organizations, and foreign securities authorities.

2. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

3. Where there is an indication of a violation or potential violation of law, whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program statute, or by regulation, rule or order issued pursuant thereto, the relevant records in the system of records may be referred to the appropriate agency, whether federal, state, or local, a foreign governmental authority or foreign securities authority, or a securities self-regulatory organization charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute or rule, regulation or order issued pursuant thereto.

4. In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

5. To a federal, state, local or foreign governmental authority or foreign securities authority maintaining civil, criminal or other relevant enforcement information or other pertinent information, such as current licenses, if necessary to obtain

4

EXHIBIT ___E___ PAGE ___54___

further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

14. To any person with whom the Commission contracts to reproduce, by typing, photocopy or other means, any record within this system for use by the Commission and its staff in connection with their official duties or to any person who is utilized by the Commission to perform clerical or stenographic functions relating to the official business of the Commission.

15. Inclusion in reports published by the Commission pursuant to authority granted in the federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)).

16. To members of advisory committees that are created by the Commission or by the Congress to render advice and recommendations to the Commission or to the Congress, to be used solely in connection with their official designated functions.

17. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 735-18, and who assists in the investigation by the Commission of possible violations of federal securities laws (as defined in Section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

18. Disclosure may be made to a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

19. To respond to inquiries from Members of Congress, the press and the public which relate to specific matters that the Commission has investigated and to matters under the Commission's jurisdiction.

20. To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78u(a), as amended.

21. To respond to subpoenas in any litigation or other proceeding.

22. To a trustee in bankruptcy.

23. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

*Small Business Owners.* The SEC always welcomes comments on how it can better assist small businesses. If you have comments about the SEC's enforcement of the securities laws, please contact the Office of Chief Counsel in the SEC's Division of Enforcement at 202-942-4530 or the SEC's Small Business Ombudsman at 202-942-2950. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman, toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

EXHIBIT _E_ PAGE _55_