# HellerEhrman
ATTORNEYS

January 21, 2005

Sara B. Brody
SBrody@hewm.com
Direct (415) 772-6473
Main (415) 772-6000
Fax (415) 772-6268

41566.0002

*Confidential*

*Via Facsimile &*
*Federal Express (with Exhibits)*

Rosanna Nardizzi
Investigator
U.S. Department of Labor
8344 E. R.L. Thornton Frwy
Suite 420
Dallas, TX 75228

Re:   Netopia/Complaint of Peter Frankl & John Deckard
      No. 6-1730-05-904

Dear Ms. Nardizzi:

We write on behalf of our client, Netopia, Inc ("Netopia," or the "Company"), in the above-referenced matter. We are in receipt of your January 3, 2005 letter to the Company, in which you refer to and attach the December 17, 2004 "whistleblower" complaint submitted by former Netopia employees Peter Frankl and John Deckard (the "Complainants").

Complainants were not victims of retaliatory or discriminatory employment practices, and they are not whistleblowers under Section 806 of the Sarbanes-Oxley Act. Instead, Complainants, subjects of an investigation conducted by the audit committee of Netopia's board of directors (the "Audit Committee Investigation"), were fired by the board *because of their misconduct*. If this complaint were allowed to proceed, it would turn Sarbanes-Oxley on its head: penalizing Netopia for terminating Frankl and Deckard based on information the Company learned in an internal investigation would mean that the statute grants immunity to corporate wrongdoers once they admit (even if not voluntarily) their misconduct. This cannot be the case, and the complaint must be dismissed.

## I.   INTRODUCTION

Messrs. Frankl and Deckard cast themselves as victims of the Company's purported attempts to cover up the truth surrounding the transactions that precipitated the Audit Committee Investigation. But Complainants' version of the story ignores the actual reasons for their terminations: Complainants (1) initiated and negotiated software transactions between Netopia and a software reseller, Interface Computer Company ("ICC"); (2) altered

Heller Ehrman White & McAuliffe LLP   333 Bush Street   San Francisco, CA 94104-2878   www.hewm.com

San Francisco   Silicon Valley   Los Angeles   San Diego   Seattle   Portland   Anchorage   New York   Washington, D.C.   Madison, WI
Hong Kong   Beijing   Singapore   Affiliated Offices:   Milan   Paris   Rome

EXHIBIT 1

**HellerEhrman**
ATTORNEYS

Rosanna Nardizzi
January 21, 2005
Page 2

the terms of the key transaction documents and negotiated secret "side agreements" with ICC executives that materially altered the terms of those transactions such that, when they were recorded as "revenue" on Netopia's books, they violated the Company's policies and basic software revenue accounting rules; and (3) hid the true nature of these transactions from Netopia's accounting department and others at the Company. Complainants' misconduct affected the information in Netopia's financial statements, and precipitated the Audit Committee Investigation, an ongoing Securities & Exchange Commission ("SEC") investigation, and the filing of numerous lawsuits in state and federal court against the Company.

Notwithstanding the story in their OSHA complaint, Mr. Frankl and Mr. Deckard did not voluntarily come forward to disclose the true nature of these transactions. It was only when they were directly confronted by the lawyers hired to assist the Audit Committee in its investigation that Complainants admitted what they had done. As a result of that investigation — and on the recommendation of the Audit Committee — Netopia's board of directors voted to terminate the employment of Messrs. Frankl and Deckard *because of their misconduct* in connection with these transactions. The terminations were not in retaliation for Complainants' statements made during the Audit Committee Investigation.

## II. FACTUAL BACKGROUND

Netopia is a 300 employee company based in Emeryville, California. Netopia develops, markets, and supports a variety of broadband and wireless equipment and service delivery software. Netopia is a public company that currently trades on the Pink Sheets OTC exchange because of the Company's delay in filing its financial statements – a direct result of Complainants' actions. It was previously listed on the NASDAQ exchange.

Peter Frankl was hired by Netopia (then called Farallon Communications, Inc.) in September 1996 as a sales supervisor, working out of Dallas, Texas. Over the years he received several promotions and at the time of his termination he was the Vice President of Worldwide Enterprise Sales and Marketing. John Deckard was hired by the Company in December 1997, as a sales representative in the Dallas office. At the time of his termination in 2004, he was the Manager of Software Sales, Western Region, in which capacity he reported to Mr. Frankl.

In addition to their base salary, Messrs. Frankl and Deckard were also paid commissions. Complainants were aware that, for software transactions of over $100,000, Netopia's policy was to pay 50% of the commission when the transaction was recorded in the

# HellerEhrman
ATTORNEYS

Rosanna Nardizzi
January 21, 2005
Page 3

Company's books as "revenue," and the remaining 50% upon receipt of payment.[1] (*See* Exhibit 1, enclosed with this submission). Therefore, they knew that they would not receive their commissions unless and until the Company booked the revenue.

The Audit Committee Investigation began in July 2004 following receipt from ICC of a copy of an October 7, 2003 side letter agreement addressed to Mr. Frankl. The side letter concerned a software transaction in which ICC acted as a "reseller," purchasing Netopia software and then reselling it to "end users."[2] In this transaction, the end user was the Philadelphia public school system (the "Philadelphia Transaction"). During the course of the ensuing investigation, the Audit Committee also discovered another improperly documented transaction, pursuant to which ICC was supposed to sell Netopia software to the Chicago public school system (the "Chicago Transaction"). We address the Chicago Transaction first because it occurred before, and laid the groundwork for, the Philadelphia Transaction.

A. The Chicago Transaction

In May 2002, Complainants negotiated a transaction whereby ICC would purchase a Netopia software and "maintenance" package,[3] and then turn around and sell the package to the Chicago public school district. At the conclusion of Mr. Frankl's negotiations with ICC, ICC sent a purchase order reflecting its intent to purchase $1,593,000 of software and maintenance, which would be delivered to the Chicago public schools. (*See* Ex. 2).

---

[1] Unlike the accounting for sales of "bricks and mortar," software revenue accounting is an extremely complicated process. It involves the application of detailed accounting rules, principles and guidelines, the most important of which is the American Institute of Certified Public Accountants' Statement of Position ("SOP") 97-2. Under SOP 97-2, if certain conditions are met, revenue from a software transaction may properly be "recognized" (i.e. taken as revenue, and, in the case of a publicly traded company like Netopia, announced to the SEC and the investing public) prior to the company's actual receipt of payment for the software. For purposes of the transactions at issue in the Audit Committee Investigation, the key variable that Netopia's accountants had to consider in deciding whether to recognize revenue prior to receipt of payment was the ultimate "collectibility" of the revenue — that is, whether the entity to which the software was sold (ICC) was firmly committed to completing the purchase, and almost certain to actually pay for the software.

[2] For a variety of reasons, many software purchasers do not buy their software directly from the company that produces it, instead allowing a reseller to act as a conduit for the transaction. This is perfectly appropriate and not suspicious.

[3] Another feature of the software industry is that many of the products sold require customization after sale and installation. Software vendors therefore often sell "maintenance" packages to go along with the software. For purposes of the transactions in question, it is important to note that revenues associated with maintenance generally cannot be recognized (recorded on the books) upon consummation of the transaction or even upon payment — instead, the revenue must be recognized in small increments over the length of the time during which the maintenance will be provided.

## HellerEhrman
ATTORNEYS

Rosanna Nardizzi
January 21, 2005
Page 4

The original ICC purchase order, dated May 23, 2002, provides that "Payment will be broken into 2 payments" and that the "Second payment will be made *upon receipt of 2nd [purchase order] from Board of Education .... [Purchase order] should be received in July and payment can be made in August.*" (*See id.*) (emphasis added). In other words, the face of this purchase order indicates that, after making an initial payment, ICC did not have to pay the balance due until ICC actually received a subsequent purchase order from the Chicago public schools. When Complainants submitted this purchase order to Netopia headquarters for processing, Netopia's order management department properly rejected the purchase order because it contained contingent terms.

Complainants needed Netopia to recognize the revenue from the Chicago Transaction in order to receive their commissions. Instead of securing a new purchase order for the portion of the total without the contingent terms, Mr. Deckard *whited-out the conditional terms* from the original ICC purchase order (apparently with Mr. Frankl's knowledge and consent) and re-submitted the altered document. (*See* Ex. 3). In addition, Mr. Deckard removed the "Ship to" information from the purchase order that indicated that Chicago school district was the intended recipient of Netopia's product. On the face of the altered purchase order, it appears that ICC had placed an order for the full value of the software without any conditions, or reliance on third parties to complete the order. Contrary to Complainants' allegations, neither Alan Lefkof, Netopia's CEO, nor David Kadish, the Company's General Counsel, knew that Mr. Deckard had altered the purchase order.

Mr. Frankl also secretly altered the terms of the arrangement with ICC in another significant way. A few days after the altered purchase order was submitted to Netopia's accounting department, he memorialized a "side agreement" with ICC in which he agreed with ICC executives that, although the purchase order indicated that the Chicago public schools would be entitled to *one year* of maintenance on the Netopia software, the Company would provide *two years* of maintenance. (*See* Ex. 4). This extra year of maintenance (had it been disclosed) would have required the Company to defer additional revenue.

B. **The Philadelphia Transaction**

Next, Mr. Frankl began working on another deal with ICC, this time to supply software to the Philadelphia school system. Mr. Frankl engineered the creation of a purchase order purporting to commemorate the deal before ICC's transaction with the end-user was in place, even though he knew the deal was contingent upon ICC's finalizing its arrangement with Philadelphia. The deal did not materialize as Mr. Frankl hoped it would, and it led to the Audit Committee Investigation.

As early as July 2003, Mr. Frankl was engaged in discussions with ICC about a "seven-figure" sale to the Philadelphia school system. (*See* Ex. 5). By the fall of 2003, Mr.

# HellerEhrman
ATTORNEYS

Roseann Nardizzi
January 21, 2005
Page 5

Frankl believed that this large transaction was unlikely to occur quickly. Accordingly, Mr. Frankl reduced the terms — he had been trying to sell a software package priced at between $3-4 million — to sell a software package for about $750,000. (*See* Ex. 6).

The $750,000 transaction was conditional on ICC receiving a purchase order from the Philadelphia public schools. Nevertheless, Mr. Frankl falsely described the terms of the deal he had supposedly finalized with ICC as non-contingent — which ultimately lead Mr. Kadish to draft a form of purchase order reflecting an unconditional final transaction with ICC. (*See* Ex. 7). The form of purchase order noted that ICC would resell the software to the Philadelphia school district, but indicated that the software would be shipped directly to ICC. (*See id.*) Crucially, the draft purchase order reflected an understanding that the deal with ICC was final, and that ICC's obligation to pay Netopia was not contingent on any other event. (*See id.*). The Philadelphia Transaction resembled the Chicago Transaction in many respects, the most critical of which was that Mr. Frankl submitted a purchase order *knowing that* that ICC would not pay for the software before it finalized its sale of the software to the end-user school district, and *there was no deal in place* between ICC and the end user.

The documents reveal Mr. Frankl's misconduct. The purchase order supposedly consummating the Philadelphia Transaction does not reflect any contingencies. (*See* Ex. 7). Yet, Mr. Frankl knew that the transaction in fact was contingent. And, on October 7, 2003, Mr. Frankl received a side letter from ICC confirming exactly that: the purchase order "is only valid upon ICC's receipt of a Purchase Order from the Philadelphia Public Schools." (*See* Ex. 8). Mr. Frankl did not provide a copy of this letter to the Company's accounting department, or (as Complainants imply) to Messrs. Lefkof or Kadish. Mr. Frankl also encouraged ICC to submit documentation to Netopia's auditors, KPMG, which falsely confirmed that ICC owed the full balance of the purchase order.

C.  **The Audit Committee Investigation**

On July 2, 2004, in a response to an email from Mr. Kadish, ICC faxed the Company a copy of the October 7, 2003 side agreement that it had sent to Mr. Frankl. (*See* Ex. 9). Receipt of ICC's fax lead to the Audit Committee Investigation (not any "whistleblowing" by Complainants). The Audit Committee asked certain employees to cooperate with the investigation. Attorneys from the San Francisco office of the Morrison & Foerster law firm, representing the Audit Committee, went to Netopia's Dallas office to interview Complainants. During the course of interviews with these lawyers, Complainants produced some of the incriminating documents, including a copy of the October 7, 2003 side agreement from ICC, and began to reveal the true nature of the transactions. The lawyers reported their findings to the Audit Committee; the Audit Committee, in turn, met with Netopia's board of directors and described the results of its investigation. Based on this report, the board of directors voted to terminate Messrs. Frankl and Deckard, for the following misconduct:

# HellerEhrman

Rossana Nardizzi
January 21, 2005
Page 5

In the Chicago Transaction, Mr. Deckard 1) altered the purchase order to hide the true terms of the deal; and 2) failed to tell Netopia's accounting department that the Chicago Transaction was contingent on ICC's receipt of a second purchase order from Chicago Public Schools.[4] Mr. Frankl 1) knew (and presumably approved) that Mr. Deckard had altered the Chicago purchase order; 2) extended the maintenance from one year to two in a side agreement with ICC; and 3) did not tell Netopia's accounting department about either the contingency, the side agreement, or the altered purchase order.

In the Philadelphia Transaction, Mr. Frankl 1) submitted a purchase order that did not reflect the true terms of the deal he had reached with ICC; 2) encouraged ICC to submit a false confirmation to KPMG; and 3) did not share the October 7, 2003 side agreement he received from ICC.

The board instructed the Company's CEO, Alan Lefkof, to carry out the terminations. On September 20, 2004, Complainants were fired.

## III. LEGAL ARGUMENT

Complainants allege that their termination was retaliatory in violation of the Corporate and Criminal Fraud Accountability Act of 2002 ("Sarbanes-Oxley," or the "Act"). Section 806 of the Act provides, in pertinent part, that a publicly traded company may not discharge an employee in retaliation for providing information, or otherwise assisting in an investigation, to a person with supervisory authority over him regarding conduct by the company that the employee reasonably believes constitutes a violation of federal securities laws, rules or regulations. 18 U.S.C. § 1514A(a)(1); *see also* 29 C.F.R. § 1980.102(a), (b)(1).

Peter Frankl and John Deckard are not "whistleblowers," under Sarbanes-Oxley or any other statute. They were fired because they falsified documents and misled the Company's accounting department — misconduct the audit committee uncovered during its investigation. That one source of that information was Complainants' interviews with the Audit Committee's lawyers cannot insulate them from their own misconduct.

Complainants' burden to prove a violation of Sarbanes-Oxley closely resembles the *McDonnell Douglas* burden-shifting analysis designed for claims brought under Title VII of the Civil Rights Act of 1968. *Halloum v. Intel Corp.*, Case No. 2003-SOX-7 (ALJ Mar. 4, 2004) (applying analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973)). Under this burden-shifting framework, Messrs. Frankl and Deckard must first establish a *prima facie* claim of whistleblower retaliation under the Act. 29 C.F.R. §

---

[4] Mr. Deckard was not involved in the Philadelphia Transaction. His actions in the Chicago Transaction were more than sufficient to justify his termination.

## HellerEhrman
ATTORNEYS

Roseana Nardizzi
January 21, 2005
Page 7

1980.104(b). If, and only if, they meet this burden, Netopia may still avoid liability simply by proffering a non-retaliatory reason for the terminations. *Yule v. Burns Int'l Security Serv.*, Case No. 1993-ERA-12 (Sec'y May 24, 1995); 29 C.F.R. § 1980.104(c). Once it has done so, Messrs. Frankl and Deckard can only prevail if they can offer evidence proving that the Company's rationale was pretextual, and not the actual motivation for their termination. *Overall v. Tennessee Valley Auth.*, Case No. 1997-ERA-53, ARB Nos. 98-111, and 128 (ARB April 30, 2001). Because of its recent enactment, the Sarbanes-Oxley Act lacks a developed body of case law. As the whistleblower provisions of Sarbanes-Oxley are similar to whistleblower provisions found in many federal statutes, it is appropriate to refer to case authority interpreting these whistleblower statutes. *Platone v. Atlantic Coast Airlines*, Case No. 2003-SOX-27 (ALJ Apr. 30, 2004).

Complainants have presented no facts that support their allegations. Instead, the undisputed evidence unequivocally demonstrates that they were fired because *they* falsified documents and misled Netopia's accounting department.

### A.   Complainants Cannot Establish A *Prima Facie* Case

To meet their *prima facie* burden, Complainants must establish by a preponderance of the evidence that: (1) they engaged in protected activity as defined by the Act; (2) Netopia was aware of the protected activity; (3) they suffered an adverse employment action; and (4) the circumstances are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. *Macktal v. U.S. Dep't of Labor*, 171 F.3d 323, 327 (5th Cir. 1999). Complainants cannot meet this burden because they cannot show that they engaged in protected activity, or that any such activity was a contributing factor in the decision to terminate their employment.

#### 1.   Complainants Did Not Engage In Protected Activity

Messrs. Frankl and Deckard were not "whistleblowers" in any sense of the word, and they are not within the class of persons Sarbanes-Oxley is intended to protect. Although Complainants may have "provided information" to the attorneys conducting the Audit Committee Investigation, in so doing they admitted *their own* misconduct. This is simply not a case where Complainants shed light on the improper conduct of others at the Company, and were terminated for exposing uncomfortable truths.

Moreover, Complainants' contention that they are whistleblowers is inconsistent with their behavior while they worked at Netopia. Netopia adopted and distributed to all employees a Code of Business Conduct & Ethics, and a Financial Information Integrity Policy. (*See* Exs. 10). In particular, the Financial Information Integrity Policy provides procedures by which employees can report "questionable accounting or auditing matters, or the reporting of fraudulent financial information." (*See* Ex. 10, at 1). Neither Mr. Frankl nor

**HellerEhrman**
ATTORNEYS

Rosanna Nardizzi
January 21, 2005
Page 8

Mr. Deckard ever took advantage of this policy. Complainants provided this information only when confronted by attorneys for the Audit Committee. "Providing information" under these circumstances should not be protected activity for the purposes of Sarbanes-Oxley.

    2.    **There Is No Inference Of Causation Because Complainants Were Not Terminated For Providing Information to The Audit Committee**

Messrs. Frankl and Deckard have set forth no facts to support an inference that they were terminated *because* they "provided information" during the Audit Committee Investigation. While Complainants allege that they were terminated because they "identified the role" of Netopia's CEO and General Counsel in the Philadelphia and Chicago transactions, there are no facts to support this charge. Indeed, it was the board of directors, not those officers supposedly implicated by Complainants, who decided to terminate Messrs. Frankl and Deckard. *See Henrich v. Ecolab, Inc.*, 2004-SOX-00051, at 10 (ALJ Nov. 23, 2004) (holding that there was no evidence that the complainant's protected activity was linked to his termination where company learned that the complainant was falsifying inspection records). Similarly, Complainants' misconduct, including altering documents, not their "protected activity" of talking to the Audit Committee's counsel, was the reason for their termination.

The board had no reason to retaliate against Messrs. Frankl or Deckard for giving information to the Audit Committee's counsel. *See Hendrix v. American Airlines, Inc.*, 2004-AIR-00010, 2004-SOX-00023, at 18 (ALJ Dec. 9, 2004). The *Hendrix* complainant was asked to participate in an internal investigation of another employee concerning activity that the complainant believed amounted to securities fraud. The court held that the complainant failed to show that his testimony in the investigation contributed to the adverse employment action because "Management supported the ... investigation from its inception ... it [is] difficult to believe that management would have encouraged Complainant's participation and encouraged him to involve internal security officials if management had something to hide." *Id.* at 18. The board was not protecting other officers or employees by firing Complainants. The board owes its fiduciary duties to the shareholders of Netopia, not to individual officers. Accordingly, the board would not discriminate against employees who expose corporate malfeasance. Messrs. Frankl and Deckard were terminated because *they were wrongdoers*.

    B.    **Netopia's Reasons For Terminating Complainants Were Not Pretextual: The Company Would Have Terminated Them For Misconduct Even If They Had Not Spoken With The Audit Committee**

Assuming, only for the sake of argument, that Complainants were able to establish a *prima facie* case, Netopia is still not liable under Section 806 of the Act — its motive for terminating Messrs. Frankl and Deckard is unimpeachable; when the board learned about

## HellerEhrman
ATTORNEYS

Rossana Nurdizzi
January 21, 2005
Page 9

Messrs. Frankl and Deckard's roles in the Philadelphia and Chicago Transactions, it decided to terminate them. The crux of the whistleblower complaint appears to be that if they were fired for their involvement in the Philadelphia and Chicago Transactions, then others in the Company should have been fired also. For the purposes of Sarbanes-Oxley, that is beside the point: Netopia only must show that it would have terminated Messrs. Frankl and Deckard even if they had not "provided information" to Audit Committee.

There are two categories of information Complainants provided to the Audit Committee. The first is the facts about their involvement in the Chicago and Philadelphia Transactions, facts that show Messrs. Frankl and Deckard engaged in systematic and intentional wrongdoing. Complainants submitted purchase orders for sales of software that could not be completed until the satisfaction of certain contingencies, and hid these contingencies from the accounting department. That is why Complainants were fired.

Based on the face of the purchase orders submitted by Complainants, Netopia recognized the revenue from the purchase orders at the time they were recorded. Messrs. Frankl and Deckard did not tell the accounting department that they had altered the purchase orders themselves and/or entered into side agreements superseding the purchase orders. These acts caused Netopia to prematurely recognize revenue on the Chicago and Philadelphia Transactions in violation of SOP 97-2 as well as Company policy. Such conduct more than justifies Complainants' termination. *See Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, 2004-SOX-11, at 10 (ALJ July 6, 2004) (complainant's violation of company revenue recognition policy was legitimate non-retaliatory reason for termination).

The second category of information that Complainants allegedly supplied to the attorneys for the Audit Committee is statements that purportedly implicated other Netopia employees in the Chicago and Philadelphia Transactions. That Complainants may *also* have provided information about others' involvement in these deals cannot insulate Complainants from an adverse employment action. Nothing Messrs. Frankl and Deckard allegedly told the attorneys for the Audit Commit absolves Complainants for their conduct. Whether other Netopia employees should have been terminated *in addition* to Messrs. Frankl and Deckard should be beyond the scope of this inquiry.[5]

One way or another, the Audit Committee would have learned of Complaints' misconduct in negotiating and submitting the transactions. Once the true documents were discovered, the nature of the deception would have been clear to investigators. Even if Complainants had no contact with the Audit Committee, it most likely would have discovered that Messrs. Frankl and Deckard undertook a deliberate effort to submit as completed transactions deals that were contingent and uncertain and then hid those facts.

---

[5] In fact, other employees have since left Netopia because of the transactions.

**HellerEhrman**
ATTORNEYS

Roozana Nardizzi
January 21, 2005
Page 10

## IV. CONCLUSION

Complainants have failed to allege a *prima facie* case of retaliation because they were not whistleblowers and their communication with the Audit Committee was not the reason they were terminated. Messrs. Frankl and Deckard were terminated because of their own misconduct, and their complaint should accordingly be dismissed.

If, after considering this submission, you or the OSHA staff have any remaining questions, Netopia requests a meeting to present its position prior to the issuance of any findings or preliminary order. Netopia also encourages you to contact the SEC staff attorneys who have been investigating this matter for several months. The SEC's lead staff attorney, Sheila O'Callaghan, can be reached at (415) 705-2459.

Very truly yours,

*Sara Brody*

Sara B. Brody

Enclosures

cc: David Kadish, Esq.

# MORRISON & FOERSTER LLP

| | | |
|---|---|---|
| SAN FRANCISCO<br>LOS ANGELES<br>DENVER<br>PALO ALTO<br>WALNUT CREEK<br>SACRAMENTO<br>CENTURY CITY<br>ORANGE COUNTY<br>SAN DIEGO | ATTORNEYS AT LAW<br><br>425 MARKET STREET<br>SAN FRANCISCO, CALIFORNIA 94105-2482<br>TELEPHONE (415) 268-7000<br>TELEFACSIMILE (415) 268-7522 | NEW YORK<br>WASHINGTON, D.C.<br>NORTHERN VIRGINIA<br>LONDON<br>BRUSSELS<br>BEIJING<br>HONG KONG<br>SINGAPORE<br>TOKYO |

October 25, 2004

Writer's Direct Contact
(415) 268-7681
CMartin@mofo.com

*FOIA CONFIDENTIAL TREATMENT REQUESTED*
*PURSUANT TO 17 C.F.R. § 200.83*

By Fax

Michael Dicke, Esq.
U.S. Securities and Exchange Commission
San Francisco District Office
44 Montgomery Street, Suite 2600
San Francisco, CA 94104

Re: *In the Matter of Netopia, Inc., MSF-2846*

Dear Mike:

As you know, the Audit Committee of Netopia Inc.'s Board of Directors has been conducting an investigation of the company's accounting practices, particularly the treatment of two transactions with Interface Computer Company ("ICC") in May 2002 and September 2003. At the commencement of that investigation, counsel for the Audit Committee alerted the Staff of the U.S. Securities and Exchange Commission (the "Staff") to the facts and circumstances giving rise to the investigation. Since then, the Audit Committee has sought to continue its cooperation with the Staff's own investigation.

Accordingly, in light of the interest of the Staff in determining whether there have been any violations of the federal securities laws and Netopia's interests in investigating and analyzing the circumstances and people involved in the events at issue, Netopia will provide to the Staff copies of certain materials which it believes are otherwise protected from discovery ("Confidential Materials").

Please be advised that by producing the Confidential Materials pursuant to this agreement, Netopia does not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties.

sf-1803259



## MORRISON & FOERSTER LLP

Michael Dicke, Esq.
October 25, 2004
Page 2

Netopia believes that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and/or the attorney-client privilege.

     The Staff will maintain the confidentiality of the Confidential Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities. Nothing in this agreement shall limit the staff's ability to use or disclose the Confidential Materials consistent with the routine uses identified in the Commission's Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena.

     The Staff will not assert that Netopia's production of the Confidential Materials to the Commission constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party. The Staff agrees that production of the Confidential Materials provides the Staff with no additional grounds to subpoena testimony, documents or other privileged materials from Netopia, although any such grounds that may exist apart from such production shall remain unaffected by this agreement. The Staff also agrees that production of these materials, even if ultimately deemed a waiver of any of these privileges, will not constitute a waiver as to any subject matter other than the ICC transactions.

     The Staff's agreement to the terms of this letter is signified by your signature on the line provided below.

Very truly yours,

*[signature]*

Craig D. Martin

AGREED AND ACCEPTED:
United States Securities and Exchange Commission

By: *[signature]*
       Office of Enforcement

sf-1803259